IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-00294-01-CR-W-HFS |
| ) | |
| TERRANCE S. HARVEY, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Harvey's Motion to Suppress Evidence. (Harvey Mot. to Suppress Evidence; Doc. #18.) For the reasons set forth below, it is recommended that the motion be denied.

I. INTRODUCTION

On October 23, 2018, the grand jury returned a one-count indictment against defendant Terrance S. Harvey. The indictment charges that on or about September 7, 2018, defendant Harvey, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit: a Taurus, Model 85, .38 caliber revolver, bearing Serial Number KG 49550, which had been transported in foreign commerce.

On June 5, 2019, an evidentiary hearing was held on defendant's motion to suppress. Defendant Harvey was represented by Assistant Federal Public Defender Stephen C. Moss. The Government was represented by Assistant United States Attorney Robert M. Smith. The Government called Chief Gordon Abraham of the Pleasant Valley, Missouri Police Department as a witness. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Chief Gordon Abraham oversees the day-to-day operations of both the operational and administrative sides of the Pleasant Valley Police Department and the communications unit for the department. (Tr. at 4.) Chief Abraham's office is right across from dispatch, so he monitors what is going on in the field throughout the day. (Tr. at 4-5.) Every morning, Chief Abraham looks at the police reports from the previous day and night. (Tr. at 5.)

2. On September 5, 2018, Capt. McGinley and Sgt. Cramer of the Pleasant Valley Police Department were dispatched to a disturbance at 6308 Ravena Road. (Tr. at 5-6.) The caller, Sharon McKinzie, identified the suspects as Kyle Gabauer and Tiffani Miller. (Tr. at 6-7.) Prior to the officers' arrival, Ms. McKinzie reported that the suspects had left. (Tr. at 6.) The responding officers, along with Chief Abraham, conducted an area canvass to try to locate the suspects. (Tr. at 6-7.) Chief Abraham was aware of the incident because he was monitoring the police radio from his desk. (Tr. at 7.) The officers were unable to locate either Gabauer or Miller. (Tr. at 7.)

3. Sgt. Cramer responded to 6308 Ravena and spoke with Ms. McKinzie and the other residents of that address. (Tr. at 7.) Sgt. Cramer was advised that they suspected that Kyle Gabauer and Tiffani Miller had stolen handguns out of a vehicle that was parked at the residence. (Tr. at 8.) Gabauer and Miller had been at the residence the day before, September 4. (Tr. at 8.) When they left, the residents had difficulty finding a set of car keys. (Tr. at 8.) Eventually, they found the keys and then looked in their vehicle. (Tr. at 8-9.) They discovered that two handguns were missing. (Tr. at 9.) Gabauer and Miller returned to the residence on September 5. (Tr. at 9.) A physical altercation took place and this was the basis for the 911 call. (Tr. at 9-10.)

4. On September 7, 2018, the Pleasant Valley Police Department received another call from the residence at 6308 Ravena. (Tr. at 11.) Officers responded and were advised that "Kyle" and a second subject described as a Hispanic male, both wearing dark clothing, had come to the residence and had left on foot. (Tr. at 11-12; Def. Exh. 3.) The caller believed that "Kyle had been no trespassed from the residence" and she was calling the police because she did not want them there. (Tr. at 12.) It was determined that "Kyle" was Kyle Gabauer, one of the persons involved in the altercation on September 5. (Tr. at 12.) To the officers' knowledge, a trespass warning had not been served on Gabauer. (Tr. at 12.) Chief Abraham was listening to this call from his office. (Tr. at 12.) Chief

2

Abraham put out information about the incident on September 5 over the air on September 7. (Tr. at 13.) Chief Abraham advised that there had been a previous disturbance and that the subjects were possibly armed. (Tr. at 13.) Chief Abraham further advised that the previous incident involved stolen firearms. (Tr. at 13.)

5. Chief Abraham responded to the area to assist in conducting an area check for the subjects involved in the disturbance who had, at this point, left the scene. (Tr. at 13-14.) Chief Abraham testified that part of the reason to track down these subjects was to serve notice of no trespassing at the residence on Ravena. (Tr. at 25, 27.) Chief Abraham testified that the other reason to track down Kyle Gabauer was that he had just been involved in another disturbance at 6308 Ravena. (Tr. at 27.) The people who resided at that residence did not want Gabauer there and he was still a suspect in the theft of the firearms from that residence. (Tr. at 27-29.)

6. Claycomo Officer Brooks observed two males matching the subjects' description as provided by the calling party walking northbound across a Phillips 66 lot and put this information over the air.[1] (Tr. at 14.) Officer Brooks observed the two males approximately five minutes after the 911 call from 6308 Ravena. (Tr. at 15.) The Phillips 66 lot is approximately one and one-half blocks from the residence at 6308 Ravena. (Tr. at 15.) The Phillips 66 gas station is out of business and there are several other businesses in this area that have closed. (Tr. at 15.) There is little foot traffic in the area. (Tr. at 15.)

7. Chief Abraham was close to the Phillips 66 lot when Officer Brooks put the information out over the air. (Tr. at 15.) Chief Abraham saw the two individuals walking northbound. (Tr. at 16.) Chief Abraham drove towards the Phillips 66, pulled into the parking lot, and exited his vehicle. (Tr. at 16.) Chief Abraham identified himself and advised the subjects to show him their hands, believing that they were possibly armed. (Tr. at 16.) Chief Abraham explained that he believed the subjects were possibly armed because he believed that one of the individuals was Kyle Gabauer and the allegation that Gabauer was involved in the theft of two firearms from 6308 Ravena. (Tr. at 16-17.)

8. Chief Abraham testified that Kyle Gabauer had other law enforcement contact between September 5 and 7, 2018. (Tr. at 18.) On September 6, Gabauer was arrested and booked for attempted first-degree burglary in Pleasant Valley at a location directly in line between the residence on Ravena and the Phillips 66 station. (Tr. at 18, 27.) Gabauer was transported to the Clay County Detention Center, where he was placed on a 24-hour investigative hold. (Def. Exh. 2.) No firearm was retrieved from Gabauer's person at that time. (Tr. at 27.) Chief Abraham had not seen Gabauer's booking photographs. (Tr. at 18.) While Chief Abraham

---

[1] Claycomo and Pleasant Valley share the same radio dispatch. (Tr. at 14.)

3

testified that he was aware of Gabauer's basic identifying information, such as race, height, and weight, from the reports, he did not know specifically what Gabauer looked like. (Tr. at 18.)

9. Chief Abraham advised the two subjects that he was going to pat them down for weapons. (Tr. at 17.) About this time, Officer Brooks was pulling up. (Tr. at 17.) Both of the subjects were wearing dark-colored clothing and Chief Abraham believed they were relatively close in age. (Tr. at 18-19.) Chief Abraham testified that the two subjects appeared to be the same race and roughly the same size. (Tr. at 19.) Chief Abraham was not sure which person was Kyle Gabauer. (Tr. at 26.) Chief Abraham approached one of the subjects (who was later identified as Terrance Harvey) and before he patted him down, asked if he had any weapons on his person. (Tr. at 17, 19, 31-32.) Harvey responded that he had a handgun in his pocket. (Tr. at 19.) Chief Abraham then recovered a handgun from Harvey's left coat pocket. (Tr. at 19.) At this time, Officer MacDonald from the Pleasant Valley Police Department had arrived on the scene. (Tr. at 19-20.) Officer MacDonald placed Harvey in handcuffs and frisked him while Chief Abraham secured the weapon. (Tr. at 20.)

10. While Chief Abraham was dealing with the subject later identified as Terrance Harvey, Officer Brooks was dealing with the other subject (who was later identified as Kyle Gabauer). (Tr. at 20.) Officer Brooks frisked Gabauer for weapons. (Tr. at 20.) Officer Brooks found a pellet gun, that looked like a semi-automatic pistol, on Gabauer's person. (Tr. at 20; Def. Exh. 3.)

11. The two subjects were detained. (Tr. at 20.) Chief Abraham testified that typically when an officer stops an individual who is a suspect in a crime, the officer obtains the individual's identifying information. (Tr. at 23.) Chief Abraham testified that he did not believe that either subject had an ID card or driver's license on them. (Tr. at 21.) When a subject does not have identification, officers obtain the person's name and date of birth verbally and then check this information through the police computers to see if the name provided matches the person who has been stopped. (Tr. at 21.) Chief Abraham further testified that even if the person stopped has a driver's license, the officers do not take the person at their word; the officers run the information through the computer. (Tr. at 21.) Chief Abraham testified that people are not always truthful with officers. (Tr. at 23.) The computer also lets the officers know the person's criminal history information, such as whether the person has outstanding warrants and whether the person is on probation or parole. (Tr. at 21.) The computer check showed that Terrance Harvey had outstanding warrants from Sugar Creek and Kansas City. (Tr. at 21.) Dispatch confirmed that both Kyle Gabauer and Harvey were convicted felons. (Tr. at 34; Def. Exh. 3.)

4

12. Chief Abraham testified that the firearm recovered from Terrance Harvey's person was fully loaded. (Tr. at 23.) Chief Abraham believed that the firearm recovered from Harvey's person matched the description of one of the stolen firearms. (Def. Exh. 3.) One of the victims from the Ravena residence responded to the scene with paperwork to confirm that the recovered firearm was one of the stolen firearms. (Tr. at 33-34; Def. Exh. 3.)

13. Both Terrance Harvey and Kyle Gabauer were arrested for investigation of stealing a firearm and for being convicted felons in possession of a firearm. (Def. Exh. 3.)

## III. DISCUSSION

Defendant Harvey seeks to suppress the evidence derived from the warrantless search and seizure of his person on September 7, 2018. (Harvey Mot. to Suppress Evidence at 1; Doc. #18.) Specifically, defendant argues:

> On that date, police officers unlawfully detained and frisked Terrance Harvey based on nothing more than his association with another person, Kyle Gabauer, who was possibly involved in the theft of two firearms several days prior to the stop. Even if, *arguendo*, police had reasonable suspicion to detain Gabauer, the officers had no legitimate reason to believe that Mr. Harvey was involved in any criminal activity.

(*Id*.) Defendant further argues: "Because the police lacked reasonable suspicion that Mr. Harvey was engaged in illegal activity, the court should suppress all evidence obtained subsequent to the stop and frisk as fruit of the poisonous tree." (*Id.* at 7.)

### A. The Constitutionality of the Stop

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. *See Terry v. Ohio*, 392 U.S. 1, 25-31 (1968). In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *See United States v.*

5

*Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

The record in this case establishes that on September 7, 2018, the Pleasant Valley Police Department received a call for help from a resident at 6308 Ravena. (Fact No. 4.) Officers responded and were advised that "Kyle" and a second subject described as a Hispanic male, both wearing dark clothing, had come to the residence. (*Id.*) The caller mistakenly believed that "Kyle had been no trespassed from the residence" and she was calling the police because she did not want them there. (*Id.*) It was determined that "Kyle" was Kyle Gabauer, one of the persons involved in an altercation that had taken place at 6308 Ravena on September 5. (Fact Nos. 2, 3, and 4.) On September 5, officers were advised by the residents at 6308 Ravena that Kyle Gabauer and Tiffani Miller, who had been at the residence on September 4, had stolen handguns out of a vehicle that was parked at the residence. (Fact No. 3.) Gabauer and Miller returned to the residence on September 5 and a physical altercation took place. (*Id.*) Officers conducted an area canvass on September 5, but were unable to locate Gabauer and Miller. (Fact No. 2.) Following the 911 call on September 7, Chief Abraham put out information about the incident on September 5 over the air. (Fact No. 4.) Chief Abraham advised that there had been a previous disturbance involving stolen firearms and that the subjects were possibly armed. (*Id.*) Approximately five minutes after the 911 call, two males matching the subjects' description as provided by the calling party were observed walking in an area where there is little foot traffic approximately one and one-half blocks from the residence at 6308 Ravena. (Fact No. 6.) Chief Abraham stopped the two subjects to investigate the reported second disturbance at 6308 Ravena, to investigate the earlier theft of the firearms from 6308 Ravena, and to serve a notice of no trespassing. (Fact No. 5.)

The Court finds that Chief Abraham had a reasonable, articulable suspicion that one of the

6

two subjects he stopped was Kyle Gabauer,[2] who allegedly was involved in the reported theft of the firearms from 6308 Ravena, the altercation on September 5, and the return to the scene of the crime on September 7, which prompted another 911 call. While Chief Abraham did not know specifically what Gabauer looked like, he was aware of Gabauer's basic identifying information, such as race, height, and weight. (Fact No. 8.) Chief Abraham testified that the two men he stopped appeared to be the same race, roughly the same size, and relatively close in age. (Fact No. 9.) The subjects matched the description given by the 911 caller and they were stopped approximately one and one-half blocks from 6308 Ravena, just minutes after the 911 call. (Fact No. 6.) Thus, the Court finds that Chief Abraham was justified in conducting an investigative stop.[3] *See United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016)("a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion.

---

[2]Defendant argues that "[t]he police had no reasonable suspicion to detain and frisk Mr. Harvey based merely on his association with Kyle Gabauer." (Harvey Mot. to Suppress Evidence at 4; Doc. #18.) However, the evidence shows that when Chief Abraham stopped the two subjects, he reasonably believed that one of the subjects was Gabauer; he just did not know which one. As set forth in *United States v. Sykes*, 914 F.3d 615, 618 (8th Cir. 2019), for stop-and-frisk purposes, the simultaneous stopping of multiple suspects for a one-person crime may be justified when an officer is virtually certain that the perpetrator is a member of the group stopped and the means of singling out the perpetrator will soon be available.

[3]At the suppression hearing, defense counsel argued that no crime took place on September 7 when Kyle Gabauer returned to the residence at 6308 Ravena because no trespass notice had been served on him. (Tr. at 28-29.) However, as set out above, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot. The Court finds that Chief Abraham had a reasonable, articulable suspicion that criminal activity may be afoot given the allegations that Gabauer was involved in the theft of two firearms from 6308 Ravena on September 4, an altercation with the residents of 6308 Ravena on September 5, an arrest for attempted first-degree burglary at a nearby location on September 6, and an unwelcome return to 6308 Ravena on September 7, which resulted in another 911 call.

B. The Seizure of Defendant Harvey

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)(citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). Protective measures also allow for the use of handcuffs. *See United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007).

Given Chief Abraham's reasonable suspicion that one of the two subjects he stopped had been involved in the theft of two firearms from 6308 Ravena on September 4, an altercation with the residents of 6308 Ravena on September 5, an arrest for attempted first-degree burglary at a nearby location on September 6, and an unwelcome return to 6308 Ravena on September 7, which resulted in another 911 call, he had a credible concern for officer safety. The Court finds that the officers had reason to believe that one or both of the subjects might be armed and dangerous. As Chief Abraham approached one of the subjects (who was later identified as Terrance Harvey), Abraham asked Harvey if he had any weapons on his person and Harvey responded that he had a handgun in his pocket. (Fact No. 9.) Chief Abraham then recovered a handgun from Harvey's coat pocket. (*Id.*) Officer MacDonald placed Harvey in handcuffs and frisked him while Chief

8

Abraham secured the weapon. (*Id.*) While Chief Abraham was dealing with Harvey, Officer Brooks was frisking the other subject (who was later identified as Kyle Gabauer). (Fact No. 10.) The Court finds that the actions taken by the officers were necessary to protect the personal safety of the officers and others and to maintain the status quo while investigating whether the subjects were involved in criminal activity. No constitutional violation took place.

C. The Arrest of Defendant Harvey

Chief Abraham believed that the firearm recovered from defendant Harvey's person matched the description of one of the stolen firearms. (Fact No. 12.) The officers had one of the victims from the Ravena residence respond to the scene with paperwork which confirmed that the recovered firearm was one of the stolen firearms. (*Id.*) When officers ran Harvey's information through the computer, it was determined that he had outstanding warrants and that he was a convicted felon. (Fact No. 11.) Defendant Harvey was arrested for investigation of stealing a firearm and for being a convicted felon in possession of a firearm. (Fact No. 13.) There was no constitutional violation.

D. Fruit of the Poisonous Tree

Finally, defendant Harvey argues that because the evidence against him was obtained as a direct result of an unreasonable stop and detention in violation of the Fourth Amendment, the evidence should be suppressed as fruit of the poisonous tree. (Harvey Mot. to Suppress Evidence at 7; Doc. #18.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that the investigative stop and the seizure of defendant Harvey were lawful. Therefore, defendant

9

Harvey's fruit of the poisonous tree argument must fail.

IV. <u>CONCLUSION</u>

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Harvey's Motion to Suppress Evidence (Doc. #18).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

          */s/ Lajuana M. Counts*
          Lajuana M. Counts
          United States Magistrate Judge